Ervin BORTH and Hertha Borth, husband and wife, Plaintiffs, Appellees and Cross-Appellants,

v.

GULF OIL EXPLORATION AND PRODUCTION COMPANY, a Division of Gulf Oil Corporation, Defendant, Appellant and Cross-Appellee.

Civ. No. 10020.

Supreme Court of North Dakota.

Dec. 22, 1981.

Fleck, Mather, Strutz & Mayer, Bismarck, for defendant, appellant and cross-appellee; argued by Gary R. Wolberg, Bismarck.

Freed, Dynes, Malloy & Reichert, Dickinson, for plaintiffs, appellees and cross-appellants; argued by Harry L. Malloy, Dickinson.

SAND, Justice.

This is an appeal by the defendant, Gulf Oil Exploration and Production Company [Gulf Oil], and a cross-appeal by the plaintiffs Ervin Borth and Hertha Borth [Borths], from a district court judgment which terminated an oil and gas lease as to 20 mineral acres owned by the Borths and validated the lease as to 60 mineral acres.

On 7 July 1976 the Borths, as lessors, and John W. Batts, as lessee, executed a ten-year oil and gas lease covering 80 acres, one-half interest in the Southwest Quarter

of Section 13, Township 145 North, Range 93 West, Dunn County, North Dakota.[1] The lease provided in pertinent part as follows:

"4. If operations for the drilling of a well for oil or gas are not commenced or if there is no oil or gas being produced on said land or on acreage pooled therewith as hereinafter provided on or before one year from the date hereof, this lease shall terminate as to both parties, *unless the lessee on or before that date shall pay or tender to the lesser* or to the lessor's credit in the Union Bank at Halliday, North Dakota 58616, or its successors, which shall continue for rental regardless of changes in the ownership of said land, the sum of One Hundred Sixty and no/100 Dollars ($160.00) which shall operate as a rental and cover the privilege of deferring the commencement of operations for drilling of a well for twelve months from said date." [Emphasis added.]

Prior to the execution of the lease with Batts, the Borths had leased the property to other third parties and were paid on the basis of 80 oil and gas mineral acres under the property.

At the time the lease was executed, the Borths informed Batts that they owned 80 mineral acres under the real property. A bonus payment of $5.00 per mineral acre was agreed upon and the Borths were given a draft for $400.00 representing the bonus payment for the 80 mineral acres. The draft was given to the Borths before Batts had an opportunity to check the title to the land.

Batts later received a title memorandum from Northwest Abstract Co. from which he concluded that the Borths owned only 60 acres of the undivided 80 mineral acres in and under the Southwest Quarter of Section 13. Relying on this information, Batts notified the Borths of his conclusion by a letter dated 2 August 1976 and delivered a corrected bonus draft in the amount of $300.00. The letter provides in part as follows:

"Title memorandum covering the SW ¼ Section 13–145N–93W, Dunn County, North Dakota, indicates that you own 37½% mineral interest, since the Dukarts conveyed ⅛th mineral interest to Michael Schmitt in 1951, and then in 1963 reserved ½ mineral interest when the land was deeded to you.

"Accordingly, we enclose check in the amount of $300.00 as bonus consideration of $5.00 an acre for oil and gas lease which you recently executed. Draft in the amount of $400.00 will be returned to your bank unpaid."

On 10 November 1976 Batts assigned the Borth lease to Gulf Oil. Gulf Oil made delayed rental payments based upon ownership of 60 mineral acres for the years 1977, 1978, and 1979. Although the Borths accepted these payments, the record suggests that they had doubts as to whether they owned 80 or 60 mineral acres. These doubts culminated in a request to their attorney to review the abstract to determine their true ownership. Borths' attorney determined that at all times material to the instant case the Borths did in fact own 80 mineral acres.

Borths' counsel, by a letter dated 14 April 1980 notified Gulf Oil that the acreage computation was incorrect and demanded a release of the lease because of a failure of consideration and underpayment of delayed rentals. By a letter dated 5 March 1980 Gulf Oil, through its attorney, responded to the demand and offered the prior bonus payment and delayed payments in light of the possible "mistake."

A notice of termination of the lease, dated 6 May 1980, was executed by the Borths' attorney and was received by Gulf Oil on 12 May 1980. On 20 May 1980 counsel for Gulf Oil sent a timely letter and affidavit to the office of the Register of Deeds of Dunn County stating that Gulf Oil did not consider the lease to be terminated and requesting that the lease not be released on the records. On 22 May 1980 Gulf Oil, through its lease rental supervisor mailed to

---

1. The lease was negotiated for Batts by Andy Matchett.

the Borths three checks payable to them. One check in the amount of $60.00 represented the additional delay rental of $1.00 per acre per year for 20 acres from 7 July 1977 to 6 July 1980. The second check, in the amount of $200.00, adjusted the original bonus payment for the 20 acres that had been omitted from the bonus paid by Batts in 1976.[2] A third check in the amount of $20.00 represented the additional lease rental for 20 acres from 7 July 1980 to 6 July 1981. These three checks were returned by Borths' attorney by a letter dated 2 June 1980. Borths' attorney also returned the annual delay rental check in the amount of $60.00 for the year 1980–81 on 23 May 1980.[3]

The Borths then began the present action to cancel the lease. The cancellation issue was tried before the court without a jury on 8 December 1980. The court made findings of fact and conclusions of law and judgment was entered terminating the lease as to an undivided 20 mineral acres and leaving the lease valid as to the remaining 60 undivided mineral acres.[4] Gulf Oil appealed, contending that the lease was valid as to the entire 80 acres and the Borths cross-appealed, contending that the entire lease should have been terminated.

■ The oil and gas lease at issue in this case contains an "unless" clause. An "unless" clause does not obligate the lessee to do an act; however, the "unless" clause provides that the lease shall terminate unless the lessee does some act, i.e., commence a well or pay delay rentals for the privilege of deferring the commencement of operations for drilling a well.[5] Williams, Oil and Gas Law, Vol. 3, § 606 (1980). An "unless" clause is construed as a clause of special limitation and if delay rental payments required by the lease are deficient in either the time or the amount of payment, the lease terminates automatically. *Norman Jessen & Associates v. Amoco Production Co.*, 305 N.W.2d 648 (N.D.1981); *Schwartzenberger v. Hunt Trust Estate*, 244 N.W.2d 711 (N.D.1976); *Woodside v. Lee*, 81 N.W.2d 745 (N.D.1957). It follows that the burden of preventing a lease with an "unless" clause from terminating lies upon the lessee.

■ The general rule is that equitable relief is not available to alleviate the hardship or termination of an "unless" clause lease; however, equitable relief is applicable under a variety of circumstances to prevent the automatic termination of a lease containing an "unless" clause. Summers, Oil and Gas, Vol. 3, § 452 (1980). *See also, Hove v. Atchison*, 238 F.2d 819 (8th Cir. 1956); *Buchanan v. Sinclair Oil & Gas Co.*, 218 F.2d 436 (5th Cir. 1956); *Norman Jessen & Associates v. Amoco Production Co., supra; Schwartzenberger v. Hunt Trust Estate, supra; Woodside v. Lee, supra; Jones v. Southern Natural Gas Co.*, 213 La. 1051, 36 So.2d 34 (1948); *Humble Oil & Refining Co. v. Harrison*, 146 Tex. 216, 205 S.W.2d 355 (1947).

Gulf Oil contends that equitable considerations prevent automatic termination of the lease in this instance. Further, Gulf Oil asserts that the entire lease should have been validated and that the trial court erred in terminating the lease as to an undivided 20 mineral acres and thereby making it a lease for an undivided 60 mineral acres. Specifically, Gulf Oil contends that the doctrines of estoppel, laches, or mutual mistake as equitable considerations were not considered by the trial court, and that the trial court simply viewed the tender of a draft for 60 acres by Batts and the acceptance by the Borths as a contract to lease only 60 mineral acres.

---

**2.** The transcript of the trial suggests that the correct amount of this check should have been $100.00.

**3.** The record does not reflect that the Borths returned the delay rental based upon 60 acres for the years from 7 July 1977 to 6 July 1980.

**4.** The district court made a finding of fact that the current value of the lease was in excess of $115.00 per acre.

**5.** In this instance it is not contended that a well was commenced within the applicable time period.

The first issue we will consider is whether or not the Borths are estopped from asserting the termination of the mineral lease because they accepted rental payments which were insufficient.

The doctrine of estoppel is contained in North Dakota Century Code § 31–11–06 and provides as follows:

"When a party, by his own declaration, act, or omission, intentionally and deliberately has led another to believe a particular thing true and to act upon such belief, he shall not be permitted to falsify it in any litigation arising out of such declaration, act, or omission."

In *Norman Jessen & Associates v. Amoco Production Co., supra* at 651, we noted that "The case for the application of equitable relief [in cases involving "unless" clauses] becomes stronger when the failure to make the proper payment is due to the conduct of the lessors." In this instance, however, we must consider the conduct and knowledge attributable to Gulf Oil and Batts.

The district court made a finding of fact that at the time the lease was executed the Borths informed Batts that they owned 80 mineral acres under the property. Pursuant to Rule 52(a), North Dakota Rules of Civil Procedure, this finding is not clearly erroneous. Nevertheless Batts relied upon a title memorandum prepared by an abstract company to reach the conclusion that the Borths owned 60 mineral acres. Gulf Oil, in its brief, states that had Batts seen the warranty deed from Grace Dukart to the Borths, he might have concluded that the Borths owned 80 mineral acres. The record does not suggest that Batts in any way attempted to resolve this inconsistency by checking the abstract or record title. Although the knowledge of employees of the abstracter may not be imputable to Batts,[6] we believe the inconsistency should have in good faith been resolved by Batts. This is especially true when consideration is given to the degree of knowledge and expertise attributable to the parties involved. The record reflects that Batts was an independent oil operator for 30 years and bought leases for his own account. Batts deemed himself to be an expert in the area of oil and gas leases. Ervin Borth testified that he had an eighth grade education, and Hertha Borth testified that she did not complete the seventh grade. Further, the district court made a finding that the Borths relied upon the representations of Batts in accepting the draft for only sixty acres, and this finding is not clearly erroneous. Rule 52(a), NDRCivP.

Pursuant to NDCC § 47–19–19 the recording of a deed is notice of the contents of the deed as to all persons. In this instance Batts and Gulf Oil are chargeable with having notice of the contents of the record title of the property in question. Further, Gulf Oil received the title memorandum from Batts that set out the chain of title to the land, but the record reflects that Gulf Oil did not examine the title memorandum nor did it examine any of the original records on file. The district court made a finding of fact to that effect and that finding is not clearly erroneous. The testimony of Michael Smith, attorney for Gulf Oil, suggests that if Gulf Oil had examined the records available to them they would have been on notice that additional examination was required. Rather, the testimony of Don R. Fisher, lease rental supervisor for Gulf Oil, reflects that in situations such as this Gulf Oil "simply relies on the thoroughness of the assignor [Batts] who researched the chain of title at the county courthouse." Although Gulf Oil asserts that it relied in good faith upon the determination made by Batts concerning the title to the oil and gas estate, we believe that Batts' conduct is chargeable to Gulf Oil and that Gulf Oil also should have examined the records available to them and that this conduct precipitated the insufficient delayed rental payments.

We do note that it is not alleged that the lease or any document properly recorded is ambiguous. Nor was it alleged there was a misconstruction of any of the documents properly recorded. See, *Humble Oil & Re-*

---

6. See, *Hanson v. Zoller*, 187 N.W.2d 47. (N.D. 1971).

*finery Co. v. Harrison*, 146 Tex. 216, 205 S.W.2d 355 (1947). Rather, the problem developed in this instance because of a failure to fully and accurately check the record title to resolve any inconsistencies, and the failure of the Borths to object to insufficient payment because of their reliance upon Batts.

▆ Based on the foregoing, we believe that each of the parties in the instant action were chargeable to some degree with the failure to properly ascertain the correct number of acres involved in the lease. The varying degrees of responsibility attributable to each of the parties to this action suggests two equitable maxims which we believe are applicable to the factual situation presented to us. The first equitable maxim is found at NDCC § 31–11–05(8) and provides as follows: "No one can take advantage of his own wrong." The second maxim is the long-standing "clean hands" doctrine that he who comes into equity must come with "clean hands." *Cross v. Farmers' Elevator Co.*, 31 N.D. 116, 153 N.W. 279 (1915). We believe the proper application of these principles necessitates that the doctrines of estoppel, laches, or mutual mistake are not available as equitable considerations to validate the entire 80-acre mineral lease. Further, because of the acceptance by the Borths of partial payment of the mineral lease, we believe that termination of the entire lease is not warranted.

Rather, we believe the principle followed in *Kugel v. Young*, 132 Colo. 529, 291 P.2d 695 (1955) should be applied to resolve the factual situation presented by this case. In *Kugel, supra*, at 703, 704, the Colorado Supreme Court made the following pertinent comment:

"Here we are confronted with the effect of a definite offer to pay the rentals within time on a certain acreage specifically described and a tender of the correct amount to cover that acreage. This offer plaintiffs [lessors] need not have accepted; but by taking the money, distributing it among themselves, and applying it to their respective individual accounts they did accept. It, as we have shown, is clear that under the *unless* type of lease the burden of preventing its termination lies wholly upon the lessee; the lessor is not required to do anything and had the lessors in this instance done nothing, the lease would have terminated in toto. Not content to remain inactive, they intervened; they did something; they took the $2,200 from the bank and applied it to their separate accounts. We believe there can be no question but that the voluntary acceptance of the stipulated per acre rental on a described area less than the whole covered by the lease works to continue the lease on the lands described and a surrender of that portion omitted. It is not a revivification of a dead contract because as to the land described the lease did not expire. Nor can it be said that this is a judicial modification of a contract between the parties, because any modification actually made in the terms of the lease was made by the acts of the parties themselves in the offer and acceptance of the rentals.

"Should it be contended on behalf of plaintiff that the rule herein announced would not apply to them because they did not know the area covered by the Young assignment and had no intention of accepting any delay rental payment on any less than the whole of the tract the answer to that simply is that while they need not have accepted the money, they did. Had they been uncertain they should have rejected the offer or at the very least refused to accept the money until they had made certain."

"On the other hand it is contended on behalf of Young and his associates and assigns [lessees] that he used reasonable diligence in trying to learn the correct description of lands included in his assignments from Tucker; that he exercised the utmost good faith and that in making the remittance of $2,200 on time had no intention other than payment of the delay rental on the entire acreage covered by the assignment from Tucker. By no stretch of imagination can it be

claimed, however, that his remittance covered in excess of 2200 acres, the exact area of the lands described in the transmittal telegram. It, therefore, becomes readily and irresistably apparent that no tender of delay rental was made to cover the southwest quarter of section 26. The burden to protect the lease is upon the lessee and his assigns. The remittance was calculated and transmitted through agencies selected by Young. Good faith and intention are not to be considered. *Ellison v. Skelly Oil Co.*, [206 Okl. 496, 244 P.2d 832] supra. He did not pay the rental on the southwest quarter of section 26 and the lease thereon terminated automatically."

Similarly, in this instance the Borths need not have accepted the insufficient payments, and, if they had not, the lease would have terminated. However, they did accept the rental payments. Further, neither can Gulf Oil successfully contend that they used reasonable diligence to ascertain the correct amount of mineral acres owned by Borths. Rather, their policy was to rely upon the thoroughness of the assignor, Batts. Based on this, we conclude that the district court properly terminated the lease as to 20 acres and also properly validated the lease as to the 60 acres paid for by Gulf Oil.

The last issue raised by Gulf Oil is that the after-acquired property doctrine should be applied to this case to prevent the Borths from withholding from Gulf Oil less than they actually conveyed or intended to convey pursuant to the oil and gas lease. See, 51 A.L.R.2d 1238 (1957). However, the first sentence of that annotation sets out its scope and provides that "this annotation is concerned with estoppel by lease where the lessor acquires, during the lease term, title to or some interest in the leased land or premises which he did not have at the time he made the lease." We do not believe the after-acquired property doctrine is applicable in this instance because the Borths did not acquire title by any conveyance or by operation of law at any time after the date of the execution of the oil and gas lease in question.

The judgment of the district court is affirmed.

ERICKSTAD, C. J., and PAULSON, PEDERSON and VANDE WALLE, JJ., concur.